Eleanor T. JOHNSON, et al., Plaintiffs,

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.

Civ. A. No. 86–3110–LFO.

United States District Court, District of Columbia.

Nov. 15, 1994.

Allen T. Eaton, W. David Allen, and David T. Smorodin, Eaton, McClellan & Allen, Washington, DC, for plaintiffs.

Fredric H. Schuster and Bruce P. Heppen, Asst. Gen. Counsel—WMATA, Washington, DC, for defendant.

### MEMORANDUM AND ORDER
OBERDORFER, District Judge.

#### I.

On March 20, 1986, Devora Johnson leaped from the train platform at the lower level of the Metro Center subway station. An oncoming subway train struck and killed her. Plaintiffs are Devora's parents. It is undisputed that decedent "assumed the risk and was contributorily negligent by jumping into the path of an oncoming train." *Johnson v. Washington Metro. Area Transit Auth.*, 764 F.Supp. 1568, 1571 (D.D.C.1991) (quoting Memorandum of February 5, 1988, at 19). Plaintiffs argue, however, that the Washington Metropolitan Area Transit Authority ("WMATA") is liable because its train operator, Keister Dixon, had the "last clear chance" to avoid Devora's death.

An Order filed on January 27, 1988 granted defendant's first motion for summary judgment. A Memorandum filed on February 5, 1988 stated the reasons for that Order. A panel of the Court of Appeals reversed and remanded, concluding that (1) conflicting evidence precluded summary judgment on the issue of whether defendant had the "last clear chance" to avoid the injury; and (2) on remand, the District Court should consider whether "the results of the drug tests [given to Dixon after the accident] are probative on the issue of whether [he] behaved wantonly or merely negligently, and if so, whether that relevance is not substantially outweighed by the danger of unfair prejudice." *Johnson v. Washington Metro. Area Transit Auth.*, 883 F.2d 125, 130 (D.C.Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990).

The Court of Appeals affirmed the legal conclusion that plaintiffs' negligence claim "was barred by Devora's assumption of the risk or at least contributory negligence." *Id.* at 128. In deciding the "last clear chance" issue, the Court of Appeals explicitly rejected defendant's claim that "one of the essential

elements of the last clear chance doctrine is that both [decedent's] and defendant's negligence must have placed the decedent in a position of peril." *Id.* at 129. The Court of Appeals also rejected defendant's argument that "the last clear chance doctrine [was] inapplicable in a suicide case." *Id.* at 130. The Court of Appeals nevertheless reversed the summary judgment because of a perceived dispute of material fact as to the extent of the train operator's opportunity to stop the train after decedent jumped and before the train struck her.

Defendant's motion for summary judgment was supported by evidence that "[a]ll the eyewitnesses testif[ied] that the train was from 4 to 20 feet away from her. No witnesses place[d] the train farther than 20 feet from decedent." Memorandum of February 5, 1988, at 12. Included in that evidence was an affidavit by Jo Ann Mary Funderburk, a WMATA employee, who was on the platform when decedent jumped. Funderburk's affidavit stated that "[a]t the time Devora Johnson jumped, she was approximately four (4) feet from the front of the train." Funderburk Aff. ¶ 5. There was no dispute that if the train had been anywhere between 4 and 20 feet away from decedent at the time she jumped, no train operator could have stopped the train before it struck her.

In addition to the testimony about distance, however, two witnesses had testified as to the amount of time between decedent's jump from the platform and the train striking her: one, Ronald Thompson, estimated that 5 to 15 seconds elapsed; another, Ricardo Louis Moore, estimated the interval to be approximately 10 seconds. Plaintiffs' expert witness testified that a reasonably prudent train operator should have been able to stop the train in 10 seconds.

Yet, both Thompson and Moore had given distance estimates that flatly contradicted these time estimates. Moore testified that decedent was only 10–12 feet from the front of the train when she jumped from the platform, and Thompson testified that decedent was no more than 20 feet from the front of the train. Moreover, both Moore and Thompson said that there was not enough time to stop the train before it struck decedent, and Thompson "acknowledged that his estimates of time were ... less reliable because of the way in which time seems to 'slow[ ] down' when an accident is witnessed." Memorandum of February 5, 1988, at 14. Nevertheless, the Court of Appeals concluded that when viewed "from the point of view most favorable to the Johnsons, [this testimony] support[ed] the conclusion that the train operator had enough time to stop the train without harming their daughter," and thus reversed the granting of summary judgment. *Johnson,* 883 F.2d at 129.

Pursuant to the remand order and the Court of Appeals' suggestions, a Memorandum and Order dated May 22, 1991 denied defendant's second motion for summary judgment, ruling that genuine issues of material fact remained on the "last clear chance" issue and on whether Dixon's conduct proximately caused the accident. *Johnson v. Washington Metro. Area Transit Auth.,* 764 F.Supp. 1568, 1583 (D.D.C.1991). By denying defendant's motion for summary judgment, the Order followed the Court of Appeals' decision and necessarily decided that the "last clear chance" doctrine did not require decedent's initial position of peril to be caused by the negligence of both plaintiffs' decedent and defendant.

Nine days later, on May 31, 1991, a different panel of the Court of Appeals decided *Andrews v. Wilkins,* 934 F.2d 1267 (D.C.Cir. 1991). *Andrews* stated explicitly that the first element of the "last clear chance" doctrine is "that plaintiff was in a position of danger caused by negligence of both plaintiff and defendant." *Id.* at 1272 (quoting *Queen v. Washington Metro. Area Transit Auth.,* 842 F.2d 476, 481 (D.C.Cir.1988) (in turn quoting *Washington Metro. Area Transit Auth. v. Jones,* 443 A.2d 45, 51 (D.C.1982))). *Andrews* did not cite *Johnson.*

Confronted with this apparent conflict, defendant filed a motion for a certificate that would authorize a petition for leave to file an interlocutory appeal. Based on the possibility of an intra-circuit split between *Johnson,* 883 F.2d 125 (D.C.Cir.1989) and *Andrews,* 934 F.2d 1267 (D.C.Cir.1991) on the issue of whether the "last clear chance" doctrine required plaintiffs to show that decedent's ini-

tial position of peril was caused by the negligence of both plaintiffs' decedent and defendant, a Memorandum and Order dated September 10, 1991, 773 F.Supp. 459, granted defendant's motion for a certificate.

With this certificate, defendant petitioned the Court of Appeals for leave to file an interlocutory appeal. A panel of the Court of Appeals denied the petition. Despite the fact that the May 22, 1991 Memorandum and Order, 764 F.Supp. 1568, necessarily followed *Johnson* and decided that the "last clear chance" doctrine did not require decedent's initial position of peril to have been caused by the negligence of both plaintiffs' decedent and defendant, the Court of Appeals concluded: "we cannot address this matter absent a district court order resolving the [certified] questions. . . . Should the district court enter a proper order, this court may then consider the merits of this matter." *Johnson v. Washington Metro. Area Transit Auth.,* No. 91–8035, Order (D.C.Cir. Nov. 4, 1991) (citing *Ray v. American Nat'l Red Cross,* 921 F.2d 324, 325–26 (D.C.Cir.1990) (per curiam))[1].

A subsequent Memorandum dated December 20, 1991 spelled out more fully the grounds for the denial of defendant's summary judgment motion, noting that "the *Johnson* opinion correctly interpreted the District of Columbia precedents" and in any case, that a district court is "bound by the law of the case as stated by the *Johnson* panel unless and until the entire Court of Appeals had at least informally approved a departure from that mandate." *Johnson v. Washington Metro. Area Transit Auth.,* 790 F.Supp. 1174, 1176–77 (D.D.C.1991) (citing *Irons v. Diamond,* 670 F.2d 265, 268 n. 11 (D.C.Cir.1981)). The accompanying Order

re-granted defendant's motion for certification. *Johnson v. Washington Metro. Area Transit Auth.,* 790 F.Supp. 1174 (D.D.C. 1991).

The defendant petitioned again for leave to file an interlocutory appeal. A different panel of the U.S. Court of Appeals denied that petition. *Johnson v. Washington Metro. Area Transit Auth.,* No. 91–8039, Order (D.C.Cir. Feb. 24, 1992). In its entirety, the Order stated:

Upon consideration of the petition for leave to file an interlocutory appeal, the answer thereto and the reply, it is

ORDERED that the petition for leave to file an interlocutory appeal be denied. Concerning the application of the last clear chance doctrine, the law of the case governs here. *See Johnson v. Washington Metro. Area Transit Authority,* 883 F.2d 125 (D.C.Cir.1989).

Two and a half months later, on April 9, 1992, the full Court of Appeals denied WMATA's suggestion for a rehearing *en banc.* On the same day, the panel that denied the petition for leave to file an interlocutory appeal amended its February 24, 1992 Order by deleting "all text after the word 'denied.' in the ordering paragraph." Because the panel "denied permission for an interlocutory appeal, the panel had no authority to instruct the district court concerning further proceedings in this case." *Johnson v. Washington Metro. Area Transit Auth.,* No. 91–8039, Order (D.C.Cir. Apr. 9, 1992).[2]

Trial then commenced on December 9, 1992. Ronald Thompson's trial testimony contradicted his deposition testimony. He

---

1. "[T]he basic requirement of an interlocutory appeal under [section] 1292(b) is that the district court have made an order. The statute does not contemplate that a district judge may simply certify a question without first deciding it." *Ray* at 325 (quoting C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* § 3930, at 156 (1977)).

2. Ambrose Bierce's "Fantastic Fables" told of:
An Associate Justice of the Supreme Court [who] was sitting by a river when a Traveler approached and said:
"I wish to cross. Will it be lawful to use this boat?"

"It will," was the reply; "it is my boat."
The Traveler thanked him, and pushing the boat into the water embarked and rowed away. But the boat sank and he was drowned.
"Heartless man!" said an Indignant Spectator. "Why did you not tell him that your boat had a hole in it?"
"The matter of the boat's condition," said the great jurist, "was not brought before me."
Ambrose Bierce, *Fantastic Fables,* in *Collected Works of Ambrose Bierce* 6:294 (1911) (quoted in Fred R. Shapiro (ed.), *The Oxford Dictionary of American Legal Quotations* (1993)).

said that decedent was on the tracks for no more than five seconds between the time she jumped and the accident. While he acknowledged his deposition testimony of ten seconds, he stated that in retrospect it could not have been ten seconds. His deposition testimony was then admitted into evidence as a prior inconsistent statement. Transcript of Trial, Volume II, December 9, 1992, at 53–57.

Between the time of Ricardo Louis Moore's deposition testimony and the trial, Moore passed away. Pursuant to Federal Rule of Civil Procedure 32(a)(3)(A), his deposition testimony was read into the record. His testimony stated that the time between the decedent's jump and when she was hit was approximately 10 seconds, maybe 5 seconds more. Transcript of Trial, Volume II, December 9, 1992, at 154.

At trial, Jo Ann Mary Funderburk testified for plaintiffs about the time between decedent's jump and when she was hit, and was then cross-examined particularly about her affidavit of November 25, 1987. When asked at trial whether the train had entered the station when decedent jumped onto the tracks, Funderburk said, "No." Transcript of Trial, Volume IV, December 11, 1992, at 368. She was then asked specifically whether she knew "how long in seconds [decedent] was on the track." She replied that she did not. *Id.* at 370. At that point, plaintiffs' counsel showed Funderburk a two-page unsworn statement that she had written on March 23, 1986, three days after the accident. Funderburk read the statement to herself. Counsel then asked Funderburk whether, having read the statement, she recalled how long it was that decedent was on the tracks. Funderburk replied, "I really don't remember, but it was very short, very short." *Id.* at 372–73. Counsel then asked the witness to read the relevant section of the statement aloud as a past recollection recorded pursuant to Federal Rule of Evidence 803(5).[3] From the statement, Funderburk read aloud: "I turned my head and started screaming and crying. About thirty

seconds elapsed when she first jumped and the time that the train hit her. She could have saved herself." *Id.* at 374.

On cross-examination, defendant's counsel asked Funderburk to read to herself a different unsworn statement that she had written, this one written on March 20, 1986, immediately after the accident. Defendant's counsel then asked Funderburk whether, having read that statement, she recalled how far the train was from decedent when she jumped. Funderburk replied, "No, I can't. Like I said before, I can't tell you." *Id.* at 377. Defendant's counsel then asked Funderburk to read the statement aloud in order to refresh her recollection. She testified: "Black lady in black—brown long coat and heels, at 8:49 walked to the edge of the platform, took small jump onto track and laid down. Train could see or hear us screaming because it was about four feet away."

Still cross-examining, defendant's counsel then asked Funderburk to read to herself her sworn affidavit dated November 22, 1987, about a year and a half after the accident. Counsel then asked her to read aloud what the affidavit said about decedent's distance from the train when she jumped onto the tracks. Funderburk testified: "At the time Devora Johnson jumped, she was approximately four feet from the front of the train." *Id.* at 379.

On redirect, plaintiffs' counsel asked Funderburk whether she disagreed with her affidavit. The testimony was as follows:

Q. And you disagree with [the affidavit]; is that correct?

A. I disagree with that four-hour thing, that four-hour thing, four minute thing—four seconds.

The Court: Four minutes?

Plaintiffs' counsel: Four whatever.

The Court: Four feet.

---

3. The unsworn statement was eventually admitted into evidence. Transcript of Trial, Volume IV, December 11, 1992, at 383–84. According to Fed.R.Evid. 803(5), the statement itself may not be admitted into evidence unless offered by an

adverse party. Since Funderburk was plaintiff's witness at trial, it may have been a mistake to admit the unsworn statement into evidence; however, there was no objection from defendant's counsel to the statement's admission.

The Witness: Four feet, yes.

*Id.* at 384–85.

On recross-examination, defense counsel again asked Funderburk to read to herself the statement of March 20, 1986, which she had made immediately after the accident. Defendant's counsel asked whether Funderburk had written the statement based upon what she had observed at the accident. She replied, "I wrote the statement after I was brought down to show them where the body were [sic]—where I saw her jump."

On reredirect, plaintiffs' counsel asked Funderburk whether she (Funderburk) was "about four feet away screaming at that point in time when [the train] hit [decedent]." Funderburk stated, "I was, yes, I was four feet away." Confronted with the testimony of Moore, Thompson and Funderburk, the jury was unable to reach a unanimous verdict after extended deliberations. On December 18, 1992, I declared a mistrial.

A second trial was scheduled to commence on September 17, 1993. At that time, a case was pending in the Court of Appeals involving the question of the proper elements of the "last clear chance" doctrine. *Belton v. Washington Metro. Area Transit Auth.*, No. 92–7248. At the request of defendant and with the consent of plaintiffs, the second trial was continued pending a decision in *Belton.* The Court of Appeals decided *Belton* on April 22, 1994. *Belton v. Washington Metro. Area Transit Auth.*, 20 F.3d 1197 (D.C.Cir. 1994). Based on *Belton,* defendant now moves for summary judgment for the third time.

### II.

The *Belton* decision effectively embraced the *Andrews* ruling that the first element of the "last clear chance" doctrine is that the plaintiff's initial position of danger be caused by the negligence of both plaintiff and defendant. The *Belton* Court thereby rejected the *Johnson* precedent with the observation that "[t]he D.C. Court of Appeals' later decision in [*Robinson v. District of Columbia*, 580 A.2d 1255 (D.C.1990)] ... restated the District's adherence to the requirement, undermining whatever force *Johnson* might have as an

interpretation of D.C. law." *Belton,* 20 F.3d at 1200. *Belton* further confirmed that it is the law as articulated by District of Columbia courts that determines what that requirement means. *Id.*

■ A reasonable trier of fact, applying *Belton* and District of Columbia precedents, could find that plaintiffs' claim, that Dixon failed to stop the train in time due to the influence of illegal drugs, satisfies this requirement. For example, plaintiffs may be able to show that Dixon came under the influence of drugs, and that defendant negligently allowed him to operate the train before decedent placed herself in danger by jumping onto the track. On this theory of the facts, a trier of fact could conclude that decedent "was in a position of danger caused by the negligence of both [plaintiffs' decedent] and defendant," and thus, the District of Columbia's "last clear chance" doctrine, as stated in *Belton,* could come into play.

■ However, even if plaintiffs established such negligence on defendant's part, an issue would remain as to whether that negligence was a proximate cause of decedent's death. For the evidence may show that even a drug-free train operator could not have stopped the train in time to avoid the accident. But the issue of proximate cause is material and factual, and the mandate in this case requires its trial.

### III.

Defendant further argues that the last clear chance doctrine is not applicable to an assumption of risk defense, but rather is only applicable to a contributory negligence defense. Since it has already been determined not only that decedent was contributorily negligent but also that she assumed the risk, *see Johnson v. Washington Metro. Area Transit Auth.,* 764 F.Supp. 1568, 1571 (D.D.C.1991), defendant argues that summary judgment should be granted even if plaintiffs could establish that defendant had the last clear chance to avoid the fatal injury suffered by the decedent.

Whether the last clear chance doctrine can bar an assumption of risk defense appears to be a question of first impression in the Dis-

trict of Columbia.[4] In fact, there appear to be very few cases in other jurisdictions that directly address the issue. Defendant has cited to a California case for the proposition that the "last clear chance" doctrine does not apply to an assumption of risk defense. *See Boyles v. Hamilton,* 235 Cal.App.2d 492, 45 Cal.Rptr. 399, 404 (1965). By contrast a Louisiana court has explicitly applied the "last clear chance" doctrine to trump an assumption of risk defense. *See Litton v. Travellers Ins. Co.,* 88 F.Supp. 76, 83 (W.D.La.1950). Neither *Boyles* nor *Litton* provide a careful analysis of the issue.

The lack of authority on this question may be due partly to the ever-present confusion surrounding the terms "assumption of risk" and "last clear chance." "Assumption of risk" is a confused term because it is used to mean many different things. The Restatement, for example, lists four different meanings. Restatement (Second) of Torts § 496A, comment c (see Appendix attached hereto).

■ The defense of "assumption of risk" is ordinarily available to a defendant when a plaintiff voluntarily incurs a known risk. *District of Columbia v. Mitchell,* 533 A.2d 629, 639 (D.C.1987). Ordinarily, this means a *voluntary* exposure to a *reasonable* risk, such as the risk taken by a spectator who enters a baseball park. The spectator "may be regarded as consenting that the players may proceed with the game without taking precautions to protect him from being hit by the ball." Restatement (Second) of Torts § 496A, comment c.

■ This meaning of "assumption of risk" contrasts with the defense of "contributory negligence." "Contributory negligence" does not require actual knowledge of any danger, and hence does not ordinarily involve voluntariness. *See Queen v. Washington Metro. Area Transit Auth.,* 842 F.2d 476, 478 (D.C.Cir.1988). It simply requires *unreasonable* conduct on the part of the plaintiff.

■ There is, however, a hybrid concept that melds "assumption of risk" with "contributory negligence," a *voluntary* exposure to an *unreasonable* risk. *See Scoggins v. Jude,* 419 A.2d 999, 1004 (D.C.1980). It is in this sense that decedent here "assumed the risk" when she jumped in front of an oncoming train. *See* Memorandum of February 5, 1988, at 19 (decedent "unreasonably and voluntarily encounter[ed] a known risk").

■ Following the Restatement, *see* Restatement (Second) of Torts § 496A, comment c, ¶ 4, the District of Columbia courts have "classified this hybrid ... as a type of contributory negligence," and explicitly subsume the analysis of this type of circumstance under "contributory negligence." *See Mitchell,* 533 A.2d at 639. While this case presents facts that differ slightly from cases involving an ordinary contributory negligence defense, District of Columbia cases say that this "concept of 'assumption of risk' overlaps with contributory negligence and amounts to the same defense." *Janifer v. Jandebeur,* 551 A.2d 1351, 1352 (D.C.1989) (citing *Scoggins,* 419 A.2d at 1004–05). It would seem to follow, therefore, that in this jurisdiction a plaintiff who voluntarily assumes an unreasonable risk, like a contributorily negligent plaintiff, could prevail by showing that defendant had the last clear chance to avoid, for example, a fatal collision.

Moreover, the only additional element involved in finding that decedent "assumed the risk" (rather than simply acted in a contributory negligent manner) in this case is the voluntariness of decedent's actions. That voluntariness arose from her attempt to commit suicide. Defendant's argument that the last clear chance doctrine is inapplicable to an assumption of risk defense in this case would thus necessarily imply that there is a suicide exception to the last clear chance doctrine. But, as noted above, the *Johnson* court explicitly rejected that exception, and

---

4. Since this is a question of District of Columbia law, it might seem appropriate to certify it to the District of Columbia Court of Appeals. The District of Columbia Code authorizes the District of Columbia Court of Appeals to "answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, or the highest appellate court of any State"; however, the D.C.Code apparently does not permit the District of Columbia Court of Appeals to answer questions certified by a federal District Court. D.C.Code § 11–723(a).

this aspect of its ruling is undisturbed. *See supra* page 1104.

Furthermore, subsequent to the initial determination that decedent legally "assumed the risk" by jumping off the platform, the Court of Appeals reversed and remanded this case without upsetting the legal determination that she had "assumed the risk." *Johnson v. Washington Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C.Cir.1989). If a finding that decedent assumed the risk had precluded consideration of the last clear chance doctrine, the Court of Appeals presumably would not have remanded, but would have affirmed the initial grant of summary judgment on the ground that decedent assumed the risk, so that plaintiffs could not recover irrespective of who had the last clear chance to avoid the ultimate impact.

### III.

There remains another possible issue: whether the dispute about material facts discovered by the Court of Appeals when it reversed the first grant of summary judgment was resolved, or resolvable, in the live testimony adduced at trial which resulted in a mistrial, i.e. whether anyone, drugged or drug-free, could have stopped the train before it struck decedent. The parties' post-trial briefs and transcript references persuade me that *at least* a preponderance of evidence establishes that no one could have stopped the train in time to save the decedent. But substantially the same evidence, buttressed by the trial testimony of Jo Ann Mary Funderburk, about the time available to the train operator to stop the train that persuaded the Court of Appeals to reverse the first summary judgment remains. *Johnson v. Washington Metro. Area Transit Auth.*, 883 F.2d 125, 128–29 (D.C.Cir.1989). That evidence precludes granting of the defendant's renewed motion. That issue must again go to the jury guided by instructions to be framed in accordance with this opinion and appellate guidance.

Accordingly, it is this 15th day of November, 1994, hereby

ORDERED: that defendant's Third Motion for Summary Judgment should be, and is hereby, DENIED; and it is further

ORDERED: that a pretrial conference will be held on *January 13, 1995 at 10:00 a.m.* in Courtroom No. 3.; and it is further

ORDERED: that a jury trial will commence on *January 18, 1995 at 10:00 a.m.* in Courtroom No. 3 for *five* days.

### APPENDIX

Restatement (Second) of Torts § 496A, comment c.

c. *Meanings of assumption of risk.* "Assumption of risk" is a term which has been surrounded by much confusion, because it has been used by the courts in at least four different senses, and the distinctions seldom have been made clear. These meanings are as follows:

1. In its simplest form, assumption of risk means that the plaintiff has given his express consent to relieve the defendant of an obligation to exercise care for his protection, and agrees to take his chances as to injury from a known or possible risk. The result is that the defendant, who would otherwise be under a duty to exercise such care, is relieved of that responsibility, and is no longer under any duty to protect the plaintiff. As to such express assumption of risk, see § 496B.

2. A second, and closely related, meaning is that the plaintiff has entered voluntarily into some relation with the defendant which he knows to involve the risk, and so is regarded as tacitly or impliedly agreeing to relieve the defendant of responsibility, and to take his own chances. Thus a spectator entering a baseball park may be regarded as consenting that the players may proceed with the game without taking precautions to protect him from being hit by the ball. Again the legal result is that the defendant is relieved of his duty to the plaintiff. As to such implied assumption of risk, see § 496C.

3. In a third type of situation the plaintiff, aware of a risk created by the negligence of the defendant, proceeds or continues voluntarily to encounter it. For example, an independent contractor who finds that he has been furnished by his employer with a machine which is in dangerous condition, and

that the employer, after notice, has failed to repair it or to substitute another, may continue to work with the machine. He may not be negligent in doing so, since his decision may be an entirely reasonable one, because the risk is relatively slight in comparison with the utility of his own conduct; and he may even act with unusual caution because he is aware of the danger. The same policy of the common law which denies recovery to one who expressly consents to accept a risk will, however, prevent his recovery in such a case. As to such implied assumption of risk, see § 496C. As to the necessity that the plaintiff's conduct be voluntary, see § 496E.

4. To be distinguished from these three situations is the fourth, in which the plaintiff's conduct in voluntarily encountering a known risk is itself unreasonable, and amounts to contributory negligence. There is thus negligence on the part of both plaintiff and defendant; and the plaintiff is barred from recovery, not only by implied consent to accept the risk, but also by the policy of the law which refuses to allow him to impose upon the defendant a loss for which his own negligence was in part responsible. (See § 467.)