Eleanor T. JOHNSON, et al., Plaintiffs,

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, Defendant.

Civ. A. No. 86–3110–LFO.

United States District Court,
District of Columbia.

Sept. 29, 1995.

David T. Smorodin, Eaton, McClellan & Allen, Washington, DC, for plaintiffs.

Fredric H. Schuster, Associate General Counsel–WMATA, Washington, DC, for defendant.

*MEMORANDUM*

OBERDORFER, District Judge.

In 1989 the Court of Appeals remanded this case for resolution of a disputed material fact: could an unimpaired operator have stopped the train after decedent appeared on the track and before the train struck her? *Johnson v. WMATA,* 883 F.2d 125, 132 (D.C.Cir.1989). One jury was unable to agree. A second jury has resolved that issue in favor of plaintiffs and has awarded damages for wrongful death and survival.

Defendant moves for judgment as a matter of law or for a new trial. As plaintiff correctly responds, the legal issues raised by defendant have already been resolved. *See Johnson v. WMATA,* 867 F.Supp. 1103 (D.D.C. 1994). The challenges to trial rulings on various items of evidence may be denied only as either decisions committed to the discretion of the trial court or, if erroneous, harmless in the context of the narrow factual issue resolved. Defendant's motions present twelve issues. They are addressed seriatim:

1. *Suicide*

█ Defendant contends that the decedent's intentional, deliberate, and intervening suicide attempt precludes plaintiffs' claim and entitles defendant to judgment as a matter of law on the authority of *District of Columbia v. Peters,* 527 A.2d 1269, 1275–76 (D.C.1987). In that case a policeman in the line of duty shot and wounded plaintiff's mentally ill decedent. Two years later decedent killed himself after he was found guilty of assaulting the police officer who shot him. The District of Columbia Court of Appeals recognized that

> as a general rule, one may not recover damages in negligence for the suicide of another. The act of suicide generally is considered to be a deliberate, intentional, and intervening act which precludes a finding that a given defendant is, in fact, responsible for the decedent's death.

*Peters,* 527 A.2d at 1275. The court recognized a serious exception where the defendant's negligence caused a mental illness which, in turn, caused the suicide, but only if the negligently caused mental illness created

an irresistible and uncontrollable impulse which deprived the suicide of a capacity to govern his conduct in accordance with reason. Peters failed to show that the police negligence created an irresistible impulse in plaintiff.

Unfortunately for defendant, the Court of Appeals opinion which remanded this case specifically addressed the *Peters* case and noted that the *Peters* rule "sheds no light on the case at bar" because *Peters* does not modify "the duty to prevent injury to others when their fate has fallen into one's hands." *Johnson*, 883 F.2d at 131–32. Nor has the remanded opinion on this issue been questioned either by the District of Columbia Court of Appeals or any panel of our Court of Appeals. *Compare* the issue of last clear chance, *infra.*

2. *Assumption of Risk*

■ There is a very respectable public policy and common sense argument that an assumption of risk defense, which precludes consideration of who had the last clear chance, would discourage suicides and that allowing a potential suicide to contemplate the possibility of compensation for heirs and next-of-kin would have an opposite and unfortunate consequence. *Compare St. Paul Fire & Marine Ins. Co. v. Molloy*, 291 Md. 139, 433 A.2d 1135 (1981) (denial of insurance payment to arsonist); *Rockingham Mutual Ins. Co. v. Hummel*, 219 Va. 803, 250 S.E.2d 774 (1979) (denial of insurance payment to arsonist). However, I remain persuaded that the controlling Court of Appeals remand decision necessarily recognized and precluded a defense based on decedent's assumption of risk. It could have affirmed the original summary judgment for defendant on that ground and conspicuously failed to do so; the facts in dispute which prompted the remand would not otherwise have been material.

3. *Last Clear Chance Doctrine*
  a. *Negligence of both plaintiff and defendant as predicate to application.*

■ The Court of Appeals' remand decision indicated that it was not necessary for plaintiff to prove that defendant, as well as

plaintiff, had a role in placing plaintiff in a position of danger in order for the last clear chance doctrine to apply. *Johnson v. WMATA*, 883 F.2d at 129. However, intervening decisions by the District of Columbia Court of Appeals, as well as subsequent decisions by our Court of Appeals, have addressed this element of the *Johnson* remand opinion and have held that, as a matter of District of Columbia law, proof of defendant's responsibility in placing plaintiff in a position of danger is required in order for the last clear chance issue even to arise. *See Belton v. WMATA*, 20 F.3d 1197, 1200 (D.C.Cir.1994); *Robinson v. District of Columbia*, 580 A.2d 1255, 1258 (D.C.1990); *compare Andrews v. Wilkins*, 934 F.2d 1267 (D.C.Cir.1991).

Efforts to obtain pretrial clarification having failed, *see Johnson v. WMATA*, 867 F.Supp. 1103, 1104–06 (D.D.C.1994), the apparently sounder course was to require plaintiffs to meet the later rendition of the Circuit rule announced in *Belton v. WMATA*, 20 F.3d 1197 (D.C.Cir.1994). Accordingly, instructions required the jury to find that the defendant as well as the plaintiff put decedent in peril.

■ Having prevailed on the doctrinal issue, defendant challenges the verdict as unsupported by evidence of defendant's responsibility for decedent's peril. Indeed, it has already been determined that defendant did nothing to cause decedent to jump onto the tracks. *Johnson*, 883 F.2d at 128. Nevertheless, the evidence clearly established that the operator ingested drugs and then proceeded to operate a subway train. From this evidence, a jury could find gross, indeed wilful, negligence.

It is now accepted as a matter of law in mass drug testing decisions that the use of drugs impairs performance without proof of impairment, and the Supreme Court has held that this fact is sufficient to justify what would otherwise be an intrusive search without probable cause in violation of the Fourth Amendment. *See, e.g., Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 620–21, 628, 109 S.Ct. 1402, 1414–15, 1418, 103 L.Ed.2d 639 (1989). By the same token the jury in this case could reasonably infer that

the operator's voluntary ingestion of drugs before he began the fatal run put decedent along with countless passengers and others who might stray into the path of his train in sufficient peril to satisfy the stricter *Belton* rendition of the last clear chance doctrine.

### b. *Decedent could have extricated herself.*

On more than one occasion defendant has unsuccessfully sought a ruling that, as a matter of law, decedent could have extricated herself from her peril by crawling into a space beside the tracks and under the platform. Defendant presented evidence to the jury about the size and accessibility of the space. Counsel addressed the issue in argument. The jury could have concluded from the evidence (albeit evidence adduced primarily from defendant's witnesses on direct and cross-examination) that a reasonable person situated on the tracks and confronted with an oncoming train would not have known of the location of a crawl space and would not have reason or opportunity to decide that it would provide safety. *Johnson,* 764 F.Supp. at 1582–83. The accessibility and feasibility of the crawl space posed a jury issue, and this issue has been decided by the jury with ample evidence from which a reasonable trier of fact could draw inferences adverse to defendant. It is immaterial that the evidence was adduced by defendant.

### 4. *Wanton and Wilful Conduct*

■ Defendant contends that plaintiffs failed to adduce evidence from which a reasonable trier of fact could find that the operator's conduct was wilful and wanton so as to overcome the defense that decedent was a trespasser. All of the evidence that sustains a finding that defendant shared responsibility for decedent's peril also justifies a finding that the operator's conduct, for which defendant was responsible, was wilful and wanton. In addition to the unimpeached drug test results, there was also evidence, necessarily viewed on this motion most favorably to plaintiffs, from which a trier of fact could reasonably infer that there was sufficient time for an operator to put on the emergency brake and that there was a material delay in the operator's pressing of the emergency

brake, proximately caused by his earlier ingestion of illegal drugs.

An eyewitness to the suicide, Mr. Ricardo Lewis Moore, testified that "[a]pproximately 10 seconds" passed "from the time [decedent] actually jumped until the train actually hit her." Trial Transcript, Jan. 18, 1995 at 48. On cross-examination, defendant's expert, Mr. Joseph Krempasky, was asked:

Q: I want you to assume that Devora Johnson was on the tracks for 10 seconds or more prior to Mr. Dixon's train hitting her. If you would make that assumption, sir, do you have an opinion to a reasonable degree of engineering certainty as to whether Mr. Dixon's train should have been able to stop prior to hitting Ms. Johnson?

A: Yes, I do have an opinion.

Q: And, sir, what is that?

A: It would not have struck the individual.

Trial Transcript, Jan. 23, 1995 at 53. Professor David J. Schorr, expert witness for the plaintiffs, also agreed that had the decedent been on the tracks for 10 seconds, the "operator should have been able to see her as she entered the train station and if he responded at that point he would have stopped before reaching the point of impact." Trial Transcript, Jan. 19, 1995 at 27.

Professor Schorr arrived at this conclusion by assuming as true the data used by defendant concerning the stopping power of the emergency brakes and the train's speed when it entered the station. Professor Schorr also assumed that a "reasonably prudent driver on operating a transportation system can perceive and react in about one second." (Mr. Krempasky agreed that a reaction time of one second is reasonable. Trial Transcript, Jan. 23, 1995 at 57.) Using this same data and making the same calculations, Professor Schorr further concluded that as decedent was, in fact, struck by the train, the operator must have responded in 4.3 seconds, and not in the 1 second that both he and defendant's expert agreed was the time that a reasonably prudent driver needed to perceive and react to an unexpected occurrence. Trial Transcript, Jan. 19, 1995 at 21–22. Finally, Dr. Baden, plaintiffs' expert wit-

ness and Director of Forensic Sciences for the New York State Police, testified that Dixon "didn't have any medical condition that would cause a delay in response—and since the presence of the drugs are the only reasons to cause delay and since they would cause such a delay it is my opinion that the delay was caused by use of these drugs." Trial Transcript, Jan. 20, 1995 at 52.

From the foregoing, a reasonable trier of fact could find that the decedent was on the tracks for 10 seconds and that the train should have been able to stop without striking the decedent; and that the train's failure to do so was proximately caused by Dixon's wilful and wanton drug use.

### 5. *Testimony of Moore and Funderburk*

Defendant renews its objection to the admission of the late Mr. Moore's deposition testimony on the ground that it is inconsistent. The Court of Appeals resolved this issue in 1989. *See Johnson*, 883 F.2d at 129. Resolution of such vexing inconsistencies is the business of jurors; their resolution of it here may not be disturbed. The same considerations overcome defendant's objection to allowing the second jury to have the transcript of Ms. Funderburk's testimony at the first trial, confused and confusing though it was.

### 6. *Bifurcation*

There was a vexing pretrial question of whether to bifurcate the trial so that the jury could decide whether a reasonable prudent operator could have stopped the train before the jury heard the damaging evidence that the operator tested positive for drugs. As the trial approached, management problems inherent in trying to insulate the jury from facts about the drug use loomed larger and larger.

Significantly, Dixon, the operator of the train, was out of the jurisdiction. His testimony was obviously vital to the plaintiffs, the defense, and the triers of fact. His *de bene* deposition included cross-examination about his drug use. This testimony, as well as the direct evidence of the tests, created a credibility issue about his ability to observe and recall accurately what he saw and did between the time the decedent appeared on the tracks and the train struck her. The credibility of his time observations was also necessarily at issue, to which drug use was highly relevant. *See* Trial Transcript, Jan. 18, 1995 at 88–125 (deposition of Dixon read before the jury). So, ultimately, I exercised my discretion and did not bifurcate the trial.

### 7. *Dixon's Post–Accident Drug Treatment Program*

■ Plaintiffs' affirmative case included evidence of Dixon's positive drug test. Exhibit 12. In cross-examining an expert witness who testified about the drug test, defendant sought to minimize its significance. In response, plaintiffs offered, over defendant's objection, proof that WMATA had suspended the operator and placed him in its drug treatment program. Defendant again argues that admission of this evidence violates Federal Rule of Evidence 407, which excludes evidence of subsequent remedial measures as proof of an admission of fault.

As the Record makes clear, however, Exhibit 12—evidence of WMATA's "subsequent measure"—was admitted, not as affirmative proof of "negligence or culpable conduct in connection with the event," but as WMATA's admission that the operator's drug use as evidenced by the tests was significant. *See* Trial Transcript, Jan. 20, 1995 at 83–88.

### 8. *Admission of the Jo Ann Funderburk Statement*

Defendant seeks a new trial because in the midst of this case, I admitted, as past-recollection recorded, a statement by Ms. Funderburk, a confused and confusing eyewitness to the event, written by her in long hand less than a week after the accident. Exhibit 24. As the evidence unfolded in the second trial, it was my judgment that this statement had as much as, or more, probative value than others she had made and that the jury should know about it in order to appraise her several accounts of the events. In addition, on the technical level, there was an "implied" charge of "improper influence" levelled against Ms. Funderburk sufficient to overcome defendant's objection. Fed.R.Evid. 801(d)(1).

Moreover, in the welter of evidence sorted out by the jury, admission of this item, even if erroneous, affected no substantial right of defendant and was therefore harmless. *See* Fed.R.Evid. 103(a); Fed.R.Civ.P. 61.

### 9. *The Roger Wood Deposition*

Defendant seeks a new trial because of a colloquy read to the jury from the deposition of Roger Wood, formerly WMATA's Manager of Safety and Fire Protection; specifically, one question and answer that could be construed as an opinion that WMATA had an affirmative duty to prevent decedent from attempting suicide. *See* Defendant's Motion for Judgment as a Matter of Law or for a New Trial at 39–40.

Defendant confuses what transpired during the January 1995 trial with what transpired during the December 1992 trial. At the earlier trial in 1992, plaintiff's counsel did indeed read to the jury that portion of Mr. Wood's deposition in which Mr. Wood stated, "It is our duty to try to prevent injury toward anyone, either accidental or self-induced, if possible." Trial Transcript, vol. 3, Dec. 10, 1992, at 282. At the January 1995 trial, however, when plaintiff's counsel again read aloud the Wood deposition, plaintiff's counsel did *not* recite this question-and-answer exchange concerning WMATA's duty to prevent suicides. *See* Trial Transcript, Jan. 20, 1995 at 96; *compare* Trial Transcript, Dec. 10, 1992 at 282. This is because two days earlier, on January 18, counsel for both parties approached the bench and discussed the admissibility of this particular question-and-answer in the Wood deposition. I sustained defendant's objection to the reading of this passage. *See* Trial Transcript, Jan. 18, 1995 at 126.

Therefore, defendant's argument on this point is moot. I had already ruled in defendant's favor on this question and the complained-of portion in the Wood deposition was not admitted at trial and was not read aloud at trial.

### 10. *Expert Witness Dr. McMahon*

■ A collateral issue was whether decedent was struck in mid-air so that it would have been demonstrably impossible to stop the train between the time she jumped and the time she was struck. Dr. McMahon, a pathologist engaged by WMATA as an expert witness, was the subject of a discovery deposition and testified at the first trial. She was out of the jurisdiction and unavailable to testify live at the second trial.

Over defendant's objection, plaintiffs read into the record McMahon's deposition testimony confirming statements in a leading question by plaintiffs' counsel that decedent's injuries "are not consistent with the finding that [decedent] was hit in mid-air ... no contrecoup lesions ... [no] multiple compound fractures in the lower legs ... no evidence that [she] was thrown to the ground. ... no evidence of bruises on the knees ... or the hips." In effect, Dr. McMahon testified that on the basis of the reports she had seen, there was no "evidence that she was hit in midair based on where she might have been struck, as in the limbs." *See* Trial Transcript, Jan. 20, 1995 at 79.

At the first trial I sustained defendant's objection because the doctor could state only that counsel's "scenario" is consistent with the injuries and did not render an opinion to a reasonable degree of medical certainty. At the second trial I overruled the objection because, like a treating physician, the doctor was essentially describing what she had observed from the autopsy reports. *See* Trial Transcript, Jan. 20, 1995 at 13–14. Whatever may have been the dispute about the lapse of time between the jump and the train impact, there was no credible evidence of an almost simultaneous, mid-air jump and hit. It was well within the function of the trier of fact to find in Dr. McMahon's deposition a confirmation of the site of plaintiff's injuries, as observed by the doctor in the autopsy report, and a confirmation of the lack of any evidence in the *autopsy reports* of a mid-air strike. That is marginally but materially different from an opinion that there was no mid-air strike. In the total context, if admission of the deposition observations was erroneous, it did not affect substantial rights of the defendant.

### 11. *Damages and the Collateral Source Rule*

■ At trial, defendant proffered the testimony of the decedent's husband that he was

responsible for providing a replacement homemaker and the testimony of an economist to value those services. I sustained plaintiffs' objection to this proffered testimony in deference to the collateral source rule. Defendant contends that this principle does not apply where the "source" has a legal obligation to support a child. Defendant cites no authority for this proposition, and independent research has disclosed none.

■ The collateral source rule is a common law doctrine providing that an "injured person may usually recover in full from a wrongdoer regardless of anything he may get from a 'collateral source' unconnected with the wrongdoer." *See District of Columbia v. Jackson,* 451 A.2d 867, 870 (D.C.1982). The reason for this rule has been that " 'it is more just that the windfall should inure to the benefit of the injured party than that it should accrue to the tort feasor.' " *Id.* (quoting *Adams v. Turner,* 238 F.Supp. 643, 644 (D.D.C.1965)).

Defendant argues that because Eric Smith is now being taken care of by his father and his stepmother, the damages calculated because of the loss of services resulting from the death of his mother, Devora, should be mitigated. This argument is untenable. Following its premises to its logical conclusion, defendant's argument would mean that no child who lost a parent would ever recover wrongful death benefits in full because the surviving parent would always have a legal obligation to take care of that child—surely, this is a perversion of the rationale of this doctrine, that it is more just that the windfall should inure to the benefit of the injured party than that it should accrue to the tort-feasor.

\*   \*   \*

Accordingly, an accompanying order denies defendant's motions in all respects.

### ORDER

For the reasons stated in the accompanying Memorandum, it is this 29th day of September, 1995 hereby

ORDERED: that defendant's motion for judgment as a matter of law, or in the alter-native, for a new trial should be, and is hereby, DENIED.