**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellant,**

v.

**Eleanor T. JOHNSON, et al., Appellees.**

**No. 96–SP–1784.**

District of Columbia Court of Appeals.

Argued April 21, 1998.
Decided March 3, 1999.

Bruce P. Heppen, with whom Robert L. Polk, Robert J. Kniaz, and Fredric H. Schuster, Washington, DC, were on the brief, for appellant.

Frank M. McClellan, with whom Allen T. Eaton and LaVern D. Wiley, Washington, DC, were on the brief, for appellees.

Jo Anne Robinson, Principal Deputy Corporation Counsel, with whom Charles L. Reischel, Deputy Corporation Counsel, and James C. McKay, Jr., Assistant Corporation Counsel, filed a brief for the District of Columbia as amicus curiae.

Before WAGNER, Chief Judge, and TERRY, STEADMAN, SCHWELB, FARRELL, RUIZ and REID, Associate Judges, and KING,* Senior Judge.

## ON REHEARING EN BANC

FARRELL, Associate Judge:

Pursuant to D.C.Code § 11–723 (1995), the United States Court of Appeals for the District of Columbia Circuit has certified the following question to this court:

Under District of Columbia law, and upon the facts described below, may a plaintiff who has voluntarily assumed an unreasonable risk of incurring a particular injury recover from a defendant who failed to

* Judge King was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on November 23, 1998.

take the last clear chance to prevent that injury?

*Johnson v. Washington Metro. Area Transit Auth.*, 321 U.S.App.D.C. 260, 261, 98 F.3d 1423, 1424 (1996) (*Johnson II*). The "facts described" by the Circuit Court pose that question in the specific context of a voluntary act of suicide. The court states:

> On March 20, 1986 Devora Johnson jumped from the subway station platform into the path of an oncoming WMATA train. The parties do not contest that Ms. Johnson jumped of her own volition and with the intention of committing suicide.

*Id.* at 261–62, 98 F.3d at 1424–25. The certified question therefore does not ask us to consider application of the doctrine of last clear chance to a negligent or even reckless plaintiff—one, for example, who sought to outrace an oncoming train in attempting to cross over the tracks. On the certified facts, Ms. Johnson intended the harm that resulted, her death. Nor are we asked to decide the question in the context of a claim of diminished capacity, where mental illness or other impairment is asserted to have limited the suicide victim's ability to appreciate her peril or encounter it purposely.[1] The certified question concerns a plaintiff who, in the Circuit Court's words, "voluntarily . . . invited the particular harm that occurred." *Id.* at 263, 98 F.3d at 1426. We hold as a matter of law that the doctrine of last clear chance may not be invoked in that situation.[2]

## I.

"The last clear chance doctrine enables a plaintiff to recover despite [her] con-

tributory *negligence.*" *District of Columbia v. Huysman*, 650 A.2d 1323, 1326 (D.C.1994) (emphasis added). Under the doctrine,

> a plaintiff . . . is permitted to recover, despite her own contributory negligence, if there is evidence (1) that the plaintiff was in a position of danger caused by *the negligence of* both *plaintiff* and defendant; (2) that the plaintiff was oblivious to the danger, or unable to extricate herself from the position of danger; (3) that the defendant was aware, or by the exercise of reasonable care should have been aware, of the plaintiff's danger and of her oblivi[ousness] to it or her inability to extricate herself from it; and (4) that the defendant, with means available to him, could have avoided injuring the plaintiff after becoming aware of the danger and the plaintiff's inability to extricate herself from it, but failed to do so.

*Felton v. Wagner*, 512 A.2d 291, 296 (D.C. 1986) (citing cases) (emphases added). To state the doctrine is thus to recognize, at the outset, that applying it to a plaintiff who was not merely negligent or even reckless, but who instead intended the very harm that befell her, would take it well beyond its normal application. Stated differently, the doctrine presupposes a plaintiff who, unlike Ms. Johnson, was oblivious to her peril or at least would have wanted to extricate herself from it if able to do so. *See Johnson II, supra*, 321 U.S.App.D.C. at 263, 98 F.3d at 1426.[3] Although the certified question is one

---

**1.** Although plaintiff cites evidence in the record of Ms. Johnson's past mental illness, that is no part of the factual predicate upon which we are asked to decide the certified question. The jury was not instructed to consider past hospitalizations of Ms. Johnson as bearing on her responsibility for her suicide; it was instructed that she "intentionally jumped from the train platform on to the tracks" and that "she was aware of and able fully to appreciate the risk that her jump on to the tracks entailed."

**2.** This case has had a lengthy history. In *Johnson v. Washington Metro. Area Transit Auth.*, 280 U.S.App.D.C. 53, 883 F.2d 125 (1989) (*Johnson I*), the Circuit Court reversed a grant of summary judgment entered in favor of WMATA in the District Court. After the first trial resulted in a mistrial, the trial court, at the second trial,

instructed the jury to determine whether WMATA had the last clear chance to save Ms. Johnson and, if so, whether the train operator had breached the applicable standard of care when he failed to take the measures available to avoid injuring Ms. Johnson. The jury found WMATA liable. *Johnson II, supra*, 321 U.S.App.D.C. at 262, 98 F.3d at 1425. WMATA appealed, and the question certified to us arises from that appeal. After a division of this court answered the certified question, *see Washington Metro. Area Transit Auth., v. Johnson*, 699 A.2d 404 (D.C. 1997), we vacated the division's opinion by order of January 15, 1998, and set the case for rehearing en banc. 704 A.2d 306.

**3.** Neither the certified facts nor any evidence cited to us supports an inference that Ms. Johnson, after throwing herself on the tracks, aban-

of first impression for this court, the answer follows logically from tort principles which this court and others have consistently employed. In applying these principles, we do not "punish" Ms. Johnson (or her estate) for her action, as Judge Ruiz's dissent charges; rather we acknowledge and enforce the disincentives to voluntary self-destruction on which society, through the civil law, insists.

■ WMATA as defendant contends that the doctrine of assumption of risk bars plaintiff's recovery, citing *inter alia* J.D. LEE & BARRY A. LINDAHL, MODERN TORT LAW § 11.04, at 324 (Rev. Ed.1997) ("The doctrine of last clear chance has no application to assumption of risk but applies solely to overcome the defense of contributory negligence."). The certified question also is framed in terms of assumption of risk. The Circuit Court was unsure how this court would analyze the relationship between assumption of risk and last clear chance because some of our decisions have "equated the voluntary assumption of an unreasonable risk with contributory negligence at least in some circumstances." *Johnson II, supra,* 321 U.S.App.D.C. at 263, 98 F.3d at 1426. *See, e.g., Janifer v. Jandebeur,* 551 A.2d 1351, 1352 (D.C.1989); *Scoggins v. Jude,* 419 A.2d 999, 1004 (D.C.1980). But, as we have already seen, this case does not concern contributory negligence. (The trial court instructed the jury that Ms. Johnson was contributorily negligent as a matter of law.). And even assumption of risk provides a loose fit considering that Ms. Johnson went beyond passive awareness and acceptance of a risk: she intended the very harm that befell her. Yet assumption of risk does furnish us guidance because it deals with the plaintiff's intentional, not merely negligent, exposure to a known danger, *see* LEE & LINDAHL, MODERN TORT LAW, *supra,* § 10.04, at 271, and it explains the legal consequence: "Because [s]he elects to proceed in the face of a known danger, the plaintiff is regarded as having consciously relieved the defendant of any

duty which he otherwise owed the plaintiff." *Sinai v. Polinger Co.,* 498 A.2d 520, 524 (D.C.1985). For this reason, we have recognized that the doctrine may bar recovery even when contributory negligence does not.

In *Martin v. George Hyman Constr. Co.,* 395 A.2d 63 (D.C.1978), for example, we held that the contributory negligence of a wage earner did not bar recovery for an accident stemming from an employer's breach of a statutory duty to provide reasonably safe working conditions. *Id.* at 71. The statute embodied a legislative judgment to "impose[ ] upon employers ... the sole responsibility for avoiding those accidents." *Id.* at 70. At the same time, we held that assumption of risk would bar recovery where the employer proved that the wage earner voluntarily spurned a safe alternative to encountering the risk and did so "with willful, wanton, or reckless disregard for his own safety." *Id.* at 74. In that event "the defense operates to relieve [the defendant of] 'all legal duty ... to the plaintiff.'" *Id.* at 71 (citation omitted). *See also East Penn Mfg. Co. v. Pineda,* 578 A.2d 1113, 1118–19 (D.C.1990) ("Contributory negligence is not a defense to a strict liability claim, but assumption of the risk bars recovery under either [negligence or strict liability].")

■ Applying these principles, Ms. Johnson did not merely act in reckless disregard of her safety, she purposely invited the harm that resulted. She thereby relieved WMATA of any duty it otherwise owed her, including a duty to grasp the final opportunity—the last clear chance—to avert a harm brought about by her own intentional act.

■ Plaintiff argues that this analysis wrongly emphasizes the conduct of Ms. Johnson to the exclusion of the behavior of the train operator, whom the jury found to have been reckless both in his primary negligence and in failing to take the last clear chance.[4] However, there is widespread authority for

doned her resolve to take her life but did so too late.

4. Because Ms. Johnson was a trespasser on the track, *see Holland v. Baltimore & Ohio R.R. Co.,* 431 A.2d 597, 599 (D.C.1981) (en banc), the jury was instructed to determine whether the train operator had been reckless in failing to take the last clear chance he had to avoid injuring her. It answered that question yes, presumably because of evidence showing that he had tested positive for cocaine and marijuana shortly after the accident.

the principle that when the plaintiff and the defendant are equally at fault, "the law leaves both parties where it finds them." *Griffin v. Shively,* 227 Va. 317, 315 S.E.2d 210, 213 (1984). Thus, the RESTATEMENT (SECOND) OF TORTS § 503(3) (1965) provides:

A plaintiff whose conduct is in reckless disregard of [her] own safety is barred from recovery against a defendant whose reckless disregard of the plaintiff's safety is a legal cause of the plaintiff's harm.

Comment c explains:

In general, the effect of the plaintiff's reckless disregard of [her] own safety is the same as that of [her] ordinary contributory negligence. The exception to this rule, stated in Subsection (3), is that where the plaintiff's conduct is itself in reckless disregard of [her] own safety, it bars [her] recovery not only from a defendant who has merely been negligent, but also from one who has acted in reckless disregard of the plaintiff's safety. The greater fault in the one case is balanced against the greater fault in the other.

The RESTATEMENT does not expressly discuss the effect of recklessness by a plaintiff upon the availability of last clear chance, although some case law does. *E.g., Conn v. Young,* 267 F.2d 725, 728 (2d Cir.1959) (noting "considerable authority" that despite availability otherwise of last clear chance doctrine, "contributory recklessness having a causal relation to an accident is an effective bar to an action based on recklessness"); *Handley v. Halladay,* 92 N.M. 76, 582 P.2d 1289, 1290 (1978) (citing cases) ("A plaintiff who is so reckless as to be in disregard of [her] own safety cannot be protected by the doctrine [of last clear chance]."). But this case does not even require us to decide the issue of reckless conduct by a plaintiff balanced against reckless conduct of a defendant. Plaintiff has cited no authority, and we have found none, that would apply last clear chance to a plaintiff's conduct deliberately intended to

bring about the harm another inflicts, either negligently or recklessly. *Volenti non fit injuria* ("to the willing no injury is done").

## II.

■ Plaintiff argues that failure to focus ultimately on the train operator's conduct rather than on Ms. Johnson's suicidal intent would relieve WMATA of accountability for violating its public trust as a common carrier. That is not so. "WMATA, like any common carrier, owes a duty of reasonable care to its passengers." *McKethean v. Washington Metro. Area Transit Auth.,* 588 A.2d 708, 712 (D.C.1991). Absolving it of a duty to a person—legally a trespasser—who jumps into the path of an oncoming train to commit suicide leaves that obligation fully intact. Further, conceding as we do that one aim of tort law is to deter negligent (and certainly reckless) behavior by actors such as WMATA's train operator, any deterrence achieved by extending tort protection to a victim who deliberately invites the harm incurred would be negligible. In the brief interval available to a train operator under the last clear chance doctrine, there is no time to determine the circumstances which placed the victim at risk, including her degree of fault (*i.e.,* whether faultless, negligent, reckless, or intending the injury); the nearly conclusive assumption guiding the driver's conduct will be his accountability to the victim at least for recklessness. *See* note 4, *supra.* And, too, the intoxicated train operator faces criminal sanctions, *see* D.C.Code § 25–127 (1996), including a possible manslaughter prosecution in case of the victim's death.[5] In sum, there is no reason to believe that a vehicle operator will react less resolutely in the case of a victim intending harm to herself because of the possibility that last clear chance will not apply.

We also cannot ignore the perverse incentive that a contrary holding might provide.

---

**5.** Plaintiff cites § 25–127 (under pain of fine and imprisonment, "[n]o person shall be intoxicated while ... operating any ... car or train of cars ... in the District of Columbia") as expressing a legislative policy not to exempt a train operator from liability to a plaintiff injured as a result of the driver's intoxication (drug or alcohol). We

glean no such policy from the statute applicable in *every* case, *i.e.,* without regard to the plaintiff's own fault, any more than we read the workplace safety statute in *Martin v. George Hyman Constr. Co., supra,* to eliminate entirely the assumption of risk defense.

At an earlier stage of this litigation District Court Judge Oberdorfer wrote:

> There is a very respectable public policy and common sense argument that an assumption of risk defense, which precludes consideration of who had the last clear chance, would discourage suicides and that allowing a potential suicide to contemplate the possibility of compensation for heirs and next-of-kin would have an opposite and unfortunate consequence.

*Johnson v. Washington Metro. Area Transit Auth.*, 901 F.Supp. 1, 3 (D.D.C.1995); *see also Johnson II*, 321 U.S.App.D.C. at 263, 98 F.3d at 1426 ("Allowing an individual to recover for injuries she has actively invited would provide an incentive—in the form of expected compensation for her heirs if not for herself—for a suicidal or financially desperate person to act upon her self-destructive impulses."). It is no answer to say that no studies have shown this to be a factor in suicide attempts; the difficulty of proving the proposition factually—for reasons in part obvious—does not detract from its common sense. Moreover, even if this incentive were wholly speculative, we remain convinced that a tort system designed to compensate for injuries caused by the fault of others is incompatible with awarding damages for deliberately invited harm.[6]

Against these considerations plaintiff cites the ameliorative and humanitarian aims of the last clear chance doctrine, first in serving to ease the harshness of the contributory negligence defense, *see* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 66, at 464 (5th ed.1984), but also in maximizing the incentives for persons able to do so to preserve the life of a helpless victim. *Cf. In re A.C.*, 573 A.2d 1235, 1246 (D.C.1990)

(en banc) (state has *parens patriae* interest in "preserving life [and] preventing suicide"). But the perceived harshness of contributory negligence and the need to ameliorate it through the last clear chance doctrine are considerations very distant from this case of a deliberately invited death. Moreover, our discussion of deterrence above explains why we are not persuaded that the values of preserving life and deterring suicide, important though they are, would be fostered by applying last clear chance to voluntary acts of suicide; quite the contrary. Retrospective application of the doctrine to WMATA's train operator could not, of course, save Ms. Johnson's life, nor would it, for the reason stated earlier, have any appreciable effect on the behavior of WMATA drivers generally, beyond the incentives already in place.[7] Last clear chance in these circumstances reduces to a gesture of compassion by the courts at the expense of someone else.

### III.

■ Suicide is a terrible act because it extinguishes a human life and because of the suffering it leaves behind. Despite these tragic consequences, or perhaps because of them, the civil law does not relax the accountability of the actor-victim: "The act of suicide generally is considered to be a deliberate, intentional, and intervening act which precludes a finding that a given defendant is, in fact, responsible for the decedent's death." *District of Columbia v. Peters*, 527 A.2d 1269, 1275 (D.C.1987).[8] Whether science one day will cast enough doubt on the volitional nature of suicide to call in question this principle is something on which we decline to speculate. We adhere to the rule of *Peters*,

---

6. Whether this would hold true in a jurisdiction unlike ours in which damages are apportioned based on fault, we have no occasion to consider.

7. Besides, as the District Court judge noted, focusing only on the helpless situation of the person who threw herself on the tracks ignores "the fact that decedent may have placed others in danger by her reckless act: By forcing the train operator to apply the mushroom brake, the decedent caused a sudden deceleration which might have injured passengers in the train." *Johnson v. Washington Metro. Area Transit Auth.*, 764 F.Supp. 1568, 1582 n. 14 (D.D.C.1991).

8. The "important exception" to this rule noted by *Peters* where the defendant's conduct "*produces* an abnormal condition which results in an uncontrollable impulse to commit suicide," 527 A.2d at 1275, 1276 (emphasis added), has no bearing on this case. Nor is it a case of an institution, such as a psychiatric hospital, having a duty of custodial care of the suicide victim. *See, e.g., McLaughlin v. Sullivan*, 461 A.2d 123, 125 (N.H.1983).

and hold that last clear chance may not be employed to restore liability in another for a plaintiff's suicidal act.

The clerk shall certify this answer to the United States Court of Appeals for the District of Columbia Circuit.

*So ordered.*

WAGNER, Chief Judge, dissenting:

For the reasons stated in Parts I and III of Judge Ruiz' dissenting opinion, I agree that the last clear chance doctrine should apply to allow a plaintiff's estate and heirs to recover against a defendant who wilfully or wantonly failed to take action to prevent the decedent's death even though the decedent intentionally placed herself in a position of peril from which she could not extricate herself.

RUIZ, Associate Judge, with whom WAGNER, Chief Judge, and REID, Associate Judge, join in Parts I and III, dissenting:

I adhere to the views expressed in the division opinion that would have applied the last clear chance doctrine to this case and permitted recovery by the suicide's family and estate against a reckless train operator who could have avoided causing Ms. Johnson's death. *See Washington Metro. Area Transit Auth. v. Johnson,* 699 A.2d 404 (D.C. 1997), *vacated,* 704 A.2d 306 (D.C.1998). That Ms. Johnson initiated the events that resulted in her death is not in dispute, but it is equally clear that, but for the train operator's recklessness, her purpose would have been foiled. The operator's failure to act as required by law was the immediate cause of this suicide's death and his actions should be correspondingly assessed with liability for the death he occasioned.[1] That result conforms with the admonitory and compensatory objectives of tort law.

I respectfully dissent from the majority for two principal reasons. First, the majority's analysis, which focuses exclusively on the suicide's conduct, undermines the policies which result in imposition of liability in those situations where the defendant has the last clear chance to avoid injury by exercising reasonable care. Second, the premise for the majority's analysis, that Ms. Johnson, a suicide, acted with the requisite voluntariness and knowledge, is inconsistent with society's condemnation of suicide and is not supported by the record sent to us by the Court of Appeals, which shows that Ms. Johnson had a history of serious mental illness requiring numerous hospitalizations.

## I.

Under the majority's analysis, the egregiousness of the defendant's conduct, its importance in the chain of causation and the foreseeability of death if the defendant did not exercise reasonable care are made irrelevant. By focussing exclusively on Ms. Johnson's conduct, and releasing WMATA and the train operator for any liability connected to her "invited" death, the majority overlooks the significance of the fact that the reckless act of the train operator in this case—the failure, due to his intoxicated condition, to stop the train when he became aware of Ms. Johnson's peril—occurred *subsequent* to Ms. Johnson's act of jumping onto the train tracks, and was the immediate cause of her death.

In the majority's view, once the voluntariness and intentionality of the plaintiff's action is established, plaintiff's consent to death relieves defendant of liability for all subsequent tortious conduct or, as in this case, even reckless behavior which causes injury or death. The majority's conclusion not only exceeds the traditional scope of the risk deemed to be assumed under assumption of risk doctrine, but also goes against the public policy exception for express agreements to assume risk. Under traditional primary assumption of risk analysis, while a plaintiff's voluntary action in encountering a known risk may relieve the defendant of certain obvious risks which the plaintiff can be said

---

1. The majority contends that where the plaintiff and defendant are equally at fault, the law "leaves [them] where it finds them." *Griffin v. Shively,* 227 Va. 317, 315 S.E.2d 210, 213 (1984).

Where one person's fault is the more immediate cause of injury, however, that person may be deemed to be at greater fault. RESTATEMENT (SECOND) OF TORTS § 479 cmt. a (1965).

to have assumed, a defendant is not excused from liability for failure to act with due care in dealing with those obvious risks nor for subsequent acts of negligent or reckless conduct. *See* Fleming James Jr., *Assumption of Risk,* 61 YALE L.J. 141, 161 (1952) (citing cases). Moreover, there are certain risks so inimical to the public interest that society does not honor private agreements to assume them. *See* RESTATEMENT (SECOND) OF TORTS § 496B cmt. g ("Where the defendant is a common carrier ... or is otherwise charged with a duty of public service, and [there is an] agreement to assume some risk relat[ing] to the defendant's performance of any part of that duty, it is well settled that it will not be given effect.").

Beyond these limitations on the assumption of risk doctrine, traditional tort analysis also leads to the conclusion that if the defendant's negligence supersedes the plaintiff's own intentional conduct and is the proximate cause of plaintiff's injury, the defendant is liable. *See Rinaldo v. N.Y. City Transit Auth.,* 39 N.Y.2d 285, 383 N.Y.S.2d 571, 573, 347 N.E.2d 897, 898 (1976) (applying doctrine of last clear chance to suicide attempt); *Wyckoff v. Davis,* 297 S.W.2d 490, 494 (Mo. 1957) (in case applying humanitarian doctrine—equivalent to last clear chance doctrine—"it is of no consequence *what* brings about *or continues* the peril, even though it be sheer hardihood or recklessness. This covers the whole range of self-exposure to peril from mere negligent inattention to utter, audacious and continuing disregard of known and avoidable danger.") (quoting *State v. Bland,* 354 Mo. 868, 191 S.W.2d 660, 662 (1945) (suggesting that humanitarian doctrine extends to suicides)); *Brooks v. New Albany & L. Elec. R. Corp.,* 280 Ky. 157, 132 S.W.2d 777, 780 (1939) ("The test is, without regard as to how she came in peril, Did the defendant's motorman in charge of the street car see, or could he by due care, have seen her peril and negligently fail to avoid injuring her? If so, the defendant is liable.") (quoting *Mullins v. Cincinnati N. & C. Ry. Co.,* 253 Ky. 156, 68 S.W.2d 790, 792 (1934)). In the few remaining jurisdictions, such as

ours, where a plaintiff's contributory negligence precludes recovery against a defendant whose negligence also contributes to the injury, the last clear chance doctrine operates to restore some equity by recognizing the defendant's greater fault as the direct cause of injury, tempering the harshness of contributory negligence. *See Washington Metro. Area Transit Auth. v. Johnson, supra,* 699 A.2d at 407–08.

The majority excepts suicide from application of the last clear chance doctrine reasoning that by her intentional suicidal act, Ms. Johnson "invited" the particular injury that killed her, citing the "ancient maxim, '*Volenti non fit injuria,*' which signifies that no wrong is done to one who consents." RESTATEMENT (SECOND) OF TORTS § 496A cmt. b. The theory of primary assumption of the risk, equated to *volenti non fit injuria,*[2] on which the majority relies,

> reflects the individualism of the common law in relationships wherein it was felt that the duty of self-protection against many hazards rested primarily on each participant.
>
> It is a negation of duty by one to look out affirmatively for the other's safety. It is clear then that the concept of assumption of risk in the primary sense is not to be considered in a situation where defendant has breached a duty towards plaintiff— where the latter has "a statutory right to protection, or a common law right or ... individual right at law to find these particular premises ... free from danger...." This means specifically that even when a danger is fully known or comprehended plaintiff is not barred from recovery simply because he chooses deliberately to encounter it....

James, *supra,* 61 YALE L.J. at 144 (noting that when there is such a right, the plaintiff may be contributorily negligent if the choice is negligent, but is not deemed to have voluntarily released the defendant of duty to the plaintiff) (internal footnote omitted).

---

2. "The distinction [between *volenti non fit injuria* and assumption of the risk] is, however, one without a difference, of terminology only, and the rules applied are the same in either case." RESTATEMENT (SECOND) OF TORTS § 496A cmt. b.

Here, the train operator was under a statutory duty not to operate the train in an intoxicated condition. *See* D.C.Code § 25-127 (1996). In such a situation, assumption of the risk may not relieve a defendant of liability because "[s]tatutes and regulations should not be overborne by the common law." *Martin v. George Hyman Constr. Co.,* 395 A.2d 63, 69 (D.C.1978); *see* RESTATEMENT (SECOND) OF TORTS §§ 483, 496F; William L. Prosser, HANDBOOK OF THE LAW OF TORTS 425–26, 453–54 (4th ed.1971). The majority relies, however, on the proposition that "willful, wanton or reckless disregard for [her] own safety" bars a plaintiff's recovery against even a defendant who has breached a statutory duty, citing *Martin, supra,* 395 A.2d at 74. *Martin,* however, does not consider the last clear chance doctrine. That is because in *Martin* there was no negligence or recklessness on the part of the defendant superseding the plaintiff's assumption of risk. Those facts easily distinguish the case before us.

## II.

The majority opinion is flawed in two respects when viewed within the particular context of a suicide.[3] First, it rests on the questionable assumption—without explanation as to whether it would make a difference to its underlying analysis of voluntariness—that Ms. Johnson's suicide was a knowing intentional act. That assumption is doubtful on this record, which shows that Ms. Johnson had a history of serious mental illness requiring numerous hospitalizations. If failure to preserve the record in this regard is the only reason why the majority does not deal with the potential impact of diminished capacity

on the voluntariness of the plaintiff's action, the majority's answer to the certified question is likely to provide limited legal guidance, as it is easy to envision that future litigants will have learned the lesson of how to conduct future trials so as to raise doubts about the suicide's mental state.[4]

Implicit in the majority's assumption that Ms. Johnson was of sufficiently sound mind when she jumped onto the tracks is the thought that at least some degree of mental incapacity or illness might reduce the "voluntariness" of the act of suicide so as to continue to hold the train conductor to society's expectations of reasonable conduct. Although I welcome a suggestion that promises to temper the majority's analysis, I believe that for purposes of imposing tort liability on a person who could have prevented death by exercise of the common law duty of due care, we should be able to raise an evidentiary presumption, as a matter of law, *against* the voluntariness and soundness of a suicidal action. *See Rinaldo, supra,* 383 N.Y.S.2d at 572, 347 N.E.2d at 898 (noting in a case where the plaintiff was struck by a subway train that "the presumption against suicide where death results from violence is well established in" New York). Our society's condemnation of suicide carries with it the evident thought that it is an unreasonable and hurtful act, taken in desperation. To the extent that certain exceptions are permitted, for example, to relieve from liability a physician who withholds or withdraws life sustaining procedures or assists in suicide, they are created pursuant to legislative determination that under certain circumstances suicide is considered within the sphere of personal and private decisions that should be allowed, and are strictly limited to those situations where

---

3. The majority opinion answers only the question of suicide and "invited" death, reserving the issue of assumption of risk by the reckless plaintiff whose conduct results in death. *See ante* at 176. The commentators, however, do not distinguish between a voluntary act and assumption of the risk, both of which have the consequence of relieving the defendant of duty to the plaintiff. *See* RESTATEMENT (SECOND) OF TORTS § 496A cmt. b, *supra* note 2.

4. In its opinion certifying the question to us, the Court of Appeals states that the parties did not contest that Ms. Johnson "jumped of her own

volition and with the intent to commit suicide." *Johnson v. WMATA,* 321 U.S.App.D.C. 260, 261–62, 98 F.3d 1423, 1425 (1996). Although evidence of Ms. Johnson's mental illness and related hospitalizations was introduced by an expert on the issue of damages and was presented to the jury before it decided that WMATA was liable for her death, the jury was not asked to find whether Ms. Johnson's suicidal act was a knowing and intentional "wish to die" or whether, as counsel suggests, it was a cry for help. As the certified answer depends on the suicide's awareness and intention, Ms. Johnson's actual mental state acquires added importance.

the patient is fully competent, professionally advised and facing a situation that is objectively recognized as hopeless, and where the patient's wish to "invite" death is unequivocally stated. *See* Uniform Determination of Death Act, D.C.Code § 6–2421 *et seq.* (1995); Oregon Death With Dignity Act, OR.REV. STAT. §§ 127.800–.897 (1995).[5] To assume, as the majority does, that the mentally ill mother of young children who jumps onto the tracks in front of an oncoming train is acting in such a clearheaded and voluntary manner, and that the law should thereby relieve the train operator of all responsibility for reckless conduct that assists the suicide in her purpose, goes against societal norms.

Second, the majority's denial of recovery revives an outdated, punitive attitude toward suicide. There is no question that if instead of having jumped, Ms. Johnson had slipped or been pushed onto the train tracks, the majority would hold WMATA liable for simple negligence. It is solely her suicidal intent that relieves WMATA of liability for its operator's reckless conduct in this case. This smacks of punishment for "bad conduct"—even though we have reason to believe that the plaintiff's fault for her conduct is likely to be mitigated by illness or pressing circumstances. Further, the majority exacts punishment not on the person who acted in contravention of society's condemnation of suicide—she is now dead—but on her estate and her family, in other words, on her children, husband and parents who survive her. We do not criminalize attempted suicide, however, recognizing that treatment, not punishment, is the indicated response. Meanwhile, the train operator who could have prevented the suicide society abhors, and who in addition acted against societal norms, recklessly and in violation not only of

the common law but also of a statute intended to protect the public that does criminalize operating a train while intoxicated, *see* D.C.Code § 25–127, is dismissed as a culpable party bearing responsibility for the injury. Why should his reprehensible conduct not be assessed with damages for the foreseeable harm it caused?

### III.

The majority closes with a quote from *District of Columbia v. Peters,* 527 A.2d 1269 (D.C.1987), that "suicide generally is considered to be a deliberate, intentional, and *intervening* act which precludes a finding that a given defendant is, in fact, responsible for the decedent's death," 527 A.2d at 1275 (emphasis added). Our decision in *Peters* does not support the majority's conclusion that "last clear chance may not be employed to restore liability in another for plaintiff's suicidal act." *Ante* at 178. What *Peters* holds is simply that a suicide attempt will normally break the causal chain "between any negligent act committed earlier [by the defendant] and the suicide victim's injury." *Johnson v. Washington Metro. Area Transit Auth.,* 280 U.S.App.D.C. 53, 59, 883 F.2d 125, 131 (1989). The important exception noted in *Peters* for situations where the defendant's negligence *produces* the condition that results in suicide, *see Peters, supra,* 527 A.2d at 1276, recognizes that, in certain cases, the defendant's negligence can be the proximate cause of the suicide and, therefore, actionable in tort. In this case there is no antecedent liability of the train operator that is sought to be "restored" by the doctrine of last clear chance. The act of suicide in this case, unlike the suicide in *Peters,* was not an *intervening* act between the defendant's negli-

---

**5.** Under the D.C. law, a physician or other listed medical personnel who withholds or withdraws life-sustaining procedures from a "qualified patient" pursuant to a valid declaration, is not subject to civil and criminal liability or considered to have behaved unprofessionally. *See* D.C.Code § 6–2427(a). The resulting death is not a suicide and the physician's actions do not constitute the crime of assisting suicide. *See* D.C.Code § 6–2428(a). A "qualified patient" is a person "who has executed a declaration in accordance [with the statute, requiring two witnesses] and who has been diagnosed and certi-

fied in writing to be afflicted with a terminal condition by 2 physicians who have personally examined the patient, one of whom shall be the attending physician." D.C.Code § 6–2421(5).

Under the Oregon law, a person who qualifies in terms of being competent and terminally ill, must make a voluntary written request, witnessed by at least two individuals, one of whom must attest to the patient's capacity and desire to die. The request to die must have been made twice orally. The person always retains the right to rescind the request to die. OR.REV.STAT. §§ 127.810 & .840.

gence and the suicide's death, but an act that *preceded* the train operator's recklessness. Here it was the train conductor's reckless conduct in failing to stop the train once he became aware of Ms. Johnson's peril due to his intoxicated state, which *superseded* the suicidal act and was the immediate cause of death. Thus, the policy of the last clear chance doctrine should guide us in this case: that a person with a duty to act should do so to prevent injury, notwithstanding that the plaintiff created the situation resulting in the risk of injury. Considering the case of a suicidal act, where the risk created is the maximum risk of death, and obvious to the defendant, the last clear chance doctrine should apply with particular force. The majority's exoneration of the defendant in such a case can only undermine society's expectations of what is reasonable conduct in light of our condemnation of suicide. *Cf. Rinaldo, supra,* 383 N.Y.S.2d at 573, 347 N.E.2d at 898 (applying last clear chance doctrine to attempted suicide situation); *Bland, supra,* 191 S.W.2d at 662 (suggesting that humanitarian doctrine extends to suicides).

At oral argument counsel for WMATA was asked to distinguish a situation where the suicide, rather than jumping onto train tracks, chooses the less public and dramatic means of taking an overdose of pills in the privacy of her home. Alerted by a family member who happens onto the scene, paramedics arrive and the person is taken to the emergency room of a nearby hospital. There, the treatment team fails to provide the indicated treatment because they are intoxicated. The patient dies. Counsel for WMATA was unable to distinguish that hypothetical from this case; neither can I. Nothing in the majority's reasoning would hold the medical personnel and hospital accountable, for in the hypothetical case the suicide similarly "invited" death and indeed achieved it by her chosen means. *But cf.* D.C.Code § 6–2427(a) (relieving medical personnel from criminal and civil liability for assisting in suicide by withholding or withdrawing life support procedures subject to limited conditions). Only application of the last clear chance doctrine, looking at the superseding breach of the duty of due care of the medical team that could have avoided an

otherwise certain death, would result in liability. The majority's conclusion to the contrary is beneath our honed principles imposing liability on one who with the superior ability and last opportunity to prevent serious injury, fails to act reasonably under the circumstances.