**Donna Jean PHILLIPS and Stanley Edward Phillips, Appellants,**

v.

**FUJITEC AMERICA, INC., et al, Appellees.**

**No. 09–CV–480.**

District of Columbia Court of Appeals.

Argued March 31, 2010.

Decided Sept. 2, 2010.

Patrick M. Regan, with whom Paul Cornoni, Washington, DC, was on the brief, for appellant.

Sidney G. Leech, Baltimore, MD, with whom David B. Stratton, Paul R. Pearson, James F. Jordan, Jack D. Lapidus, David F. Grimaldi, Washington, DC, and John J. O'Neill, Jr., were on the brief, for all ap-

pellees excluding U.S. Security Associates, Inc.

Andrew J. Marcus, with whom Joseph S. Crociata and Andrew Butz, Washington, DC, were on the brief, for appellee U.S. Security Associates, Inc.

Before RUIZ and KRAMER, Associate Judges, and FARRELL, Senior Judge.

KRAMER, Associate Judge:

Dawn Marie Phillips fell to her death when she attempted to get out of an elevator that had stalled between floors in the Residences at Gallery Place Condominium on the evening of November 24, 2005. Her parents brought this negligence action against appellees, alleging that they failed to properly maintain and safely operate the elevator. After discovery, the trial court held, as a matter of law, that no reasonable juror could find for appellant because Ms. Phillips had assumed the risk of injury by attempting to leave the elevator while it was stuck between floors. Although we conclude, unlike the trial court, that contributory negligence rather than assumption of the risk furnishes the proper framework for resolving this case, we affirm because we hold that Ms. Phillips was contributorily negligent as a matter of law.

### I. Factual Background

On the night of her death, Ms. Phillips had Thanksgiving dinner with her friends the Snows, who resided on the ninth floor of the Residences. As she was leaving, Mr. Snow accompanied Ms. Phillips so that he could walk her to her car. Mr. Snow's deposition testimony established the events that took place as follows.[1]

On the way down, the elevator came to a slow stop between the seventh and the sixth floors. The lights flickered, but stayed on. Mr. Snow noticed that the elevator cab doors were partially open. He attempted to get the elevator going again by opening and closing the doors a few times, to no avail. Eventually, he was able to extricate himself from the elevator by employing his training as a first responder.[2] He first forced the cab doors open. He then found the latch for the doors to the sixth floor lobby and opened them. After first lying down inside the elevator cab, he lowered himself to the landing on the sixth floor by crawling out of the cab on his stomach, feet first. The doors closed after he performed this maneuver. He then left Ms. Phillips to seek help. Meanwhile, Ms. Phillips found the emergency phone in the elevator and placed a call, but received no answer. She also pressed the "Alarm" button. Finally, using her cell phone, she called Mrs. Snow, who missed the call. She then hailed Mr. Snow, who was talking to the security officer in the main lobby and attempting to lower the elevator with an override key. Ms. Phillips asked him to come back up to the sixth floor.

When Mr. Snow arrived, Ms. Phillips informed him that she wanted to leave the elevator. He told her that management was getting help and she should stay in the elevator because the gap below the elevator cab opened into the elevator shaft, but Ms. Phillips replied; "I don't care. I want to come out the same way you did." Mr. Snow knew that she had a heart condition. He thought Ms. Phillips sounded like she was getting anxious, and, thinking that she

---

1. Appellants disputed several aspects of Mr. Snow's testimony in their opposition to summary judgment, but offered no factual basis for their contentions.

2. Mr. Snow is six feet two inches tall. He is a physically fit runner and an FBI agent and former marine.

would calm down if the doors were open, he told her how to open the doors. He again asked her to stay in the elevator, saying "[t]hey are going to be here soon," but Ms. Phillips refused. She first tried to come out of the elevator facing forward, with Mr. Snow cupping his hands beneath her foot, but failed. Mr. Snow told her she could not come out that way and advised her to lie on her stomach and lower herself, as he had done. As she did so, she told him that she did not want him to touch her because she was concerned about her body image. Something went wrong during the maneuver, and Ms. Phillips fell through the gap between the bottom of the elevator cab and the sixth floor landing[3] and down the elevator shaft to her death.

The trial court concluded, as a matter of law, that Ms. Phillips had assumed the risk of injury or death when she tried to leave the elevator. "There is simply no evidence," the court ruled, "from which a reasonable juror could conclude other than that Ms. Phillips was aware of the risk of grievous injury, but chose to ignore that risk and attempt to leave the elevator." The court explained:

> Mr. Snow's repeated admonitions to her that it was unsafe to exit and his specific warning that there was a hole beneath the elevator were more than sufficient to appraise (*sic*) a person of Ms. Phillips's intelligence that it was exceedingly dangerous for her to attempt to escape. A person in her position would have been aware there was a risk that she would

slip into the gap and fall down the shaft, even without knowing the exact size of the opening. . . . Plaintiffs have presented no evidence that it was unsafe for Ms. Phillips to remain in the elevator. Indeed, the unrebutted evidence on that issue, including testimony from Plaintiffs' own expert, is that Ms. Phillips was not in any danger.

While reaching these conclusions, the court rejected the defense contention that Ms. Phillips had been contributorily negligent as a matter of law. It did so relying on the "sudden emergency doctrine," which provides that "[a]cts which, if done in calm deliberateness, might be judged negligent, may yet not be so regarded where done spontaneously in response to a normal impulse without adequate opportunity for reflection."[4] The court reasoned: "[A] jury could find that Ms. Phillips had a reasonable fear of impending danger if she remained on the elevator, even if the evidence did establish that [she] was negligent in attempting to leave [it]," and thus "the sudden emergency doctrine could apply" and present a triable issue except for the fact—as the judge then concluded—that she had voluntarily assumed the risk of injury from leaving.

## II. Standard of Review

We review a grant of summary judgment *de novo*. In doing so, we view the facts in the light most favorable to the non-moving party and ask whether "the record demonstrates that there is no genuine issue of material fact on which a jury could find for the non-moving party."[5] In

---

3. An inspection after the incident established that the gap Ms. Phillips fell through was 50 inches high. In other words, the elevator had stalled while the bottom of its passenger cab was 50 inches above the sixth floor landing. In contrast, the gap through which Ms. Phillips attempted to crawl through, i.e. the distance between the cab floor and the top of the landing doors, was only 15 inches high.

4. *Kelley v. Safeway Stores, Inc.*, 105 U.S.App. D.C. 406, 409, 267 F.2d 683, 686 (1959) (quoting *Burkert v. Smith*, 201 Md. 452, 458, 94 A.2d 460, 462 (1953)).

5. *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983).

other words, does the evidence present "a sufficient [factual] disagreement to require submission to a jury or is [it] so one-sided that one party must prevail as a matter of law."[6]

## III. Legal Analysis

The sole issue appellant raises is whether, based on the record before us, a reasonable jury could conclude that Ms. Phillips did not assume the risk of falling through the gap between the elevator cab and the landing. Put differently, we are asked to determine whether the record supports the legal conclusion that Ms. Phillips so clearly "assumed the risk" that no reasonable juror could find for appellants. Appellees, in addition to defending the trial court's ruling, assert that Ms. Phillips was contributorily negligent as a matter of law.

■ As a threshold matter, we note that two related but distinct common law theories could potentially bar recovery in a case like this. First, if a plaintiff "by [her] own negligence ... proximately contribut-ed to the injury," she cannot recover.[7] A second theory, commonly known as assumption of the risk, also bars recovery where a plaintiff voluntarily encounters a known risk.[8] Though these two defenses may overlap, each requires a different analytical approach. Contributory negligence usually requires a determination of the reasonableness of the plaintiff's conduct, whereas assumption of risk focuses on the voluntariness of it.[9] Crucially, assumption of the risk typically involves a "voluntary exposure to a *reasonable* risk,"[10] such as the risk incurred by attendees of spectator sports events.[11]

■ Where the plaintiff voluntarily but *unreasonably* accepts a known risk created by the defendant's negligence, either defense could theoretically apply.[12] In *Scoggins*, however, this court—in keeping with the Restatement (Second) of Torts— chose to analyze such "hybrids" as contributory negligence cases, because the focus in such cases is on the reasonableness of the plaintiff's conduct rather than the voluntariness of it.[13] We choose similarly to

6. *Hill v. White*, 589 A.2d 918, 921 n. 8 (D.C. 1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

7. E.H. Schopler, Annotation, *The distinction between assumption of risk and contributory negligence*, 82 A.L.R.2d 1218 (2010) (quoting 38 AM JUR. *Negligence* § 174).

8. *Harris v. Plummer*, 190 A.2d 98, 100 (D.C. 1963).

9. *Id.*

10. *Scoggins v. Jude*, 419 A.2d 999, 1004 (D.C. 1980) (citing RESTATEMENT (SECOND) OF TORTS § 496A, cmt. c) (emphasis added).

11. *See id.* ("[E].g., attendance at a baseball game, where balls are hit sharply into the stands.").

12. RESTATEMENT § 496A, cmt. d ("In theory ... assumption of risk rests upon the voluntary consent of the plaintiff to encounter the risk and take his chances, while contributory negligence rests upon his failure to exercise the care of a reasonable man for his own protection. Where the plaintiff voluntarily consents to take an unreasonable chance, there may obviously be both.").

13. *See Scoggins, supra* note 10, 419 A.2d at 1004 ("For purposes of our own analysis, we ... limit the assumption-of-risk discussion to reasonable voluntary risk-taking, and consider all unreasonable risk-taking under the heading of contributory negligence....."). *See also* RESTATEMENT § 466(a) and (b). *But cf. Washington Metro. Area Transit Auth. v. Johnson*, 726 A.2d 172 (D.C.1999) (*en banc*). As *Johnson* demonstrates, we have not rigidly applied *Scoggins's* approach in every case. For example, in *Johnson*, we applied assumption of risk principles—responding to a certified question which posed the issue in terms of that doctrine—to the conduct of a suicidal person who "went beyond passive awareness

apply that framework here. Ms. Phillips could not have been unaware that the gap below the elevator cab presented her with an unreasonable risk if she tried to exit.[14] She knew that the gap was there, and was told several times by Mr. Snow that it would be unsafe for her to climb down. Moreover, even though she did not know the exact size of the gap below the cab, she did know that the opening she had to crawl through to leave the elevator cab was quite narrow,[15] such that she should have been able to reasonably conclude that the remaining distance between the cab and the landing floor was significant. Appellants' own elevator expert opined that it is widely recommended that passengers should stay inside the elevator when it gets stuck between floors; he further stated that Ms. Phillips "would have been fine" had she stayed in the cab. It follows that Ms. Phillips voluntarily exposed herself to an unreasonable risk of death or injury by trying to leave. Therefore, since the risk she voluntarily encountered was unreasonable, contributory negligence, rather than assumption of the risk, furnishes the applicable analytical framework.

 Applying that framework, we conclude that Ms. Phillips was contributorily negligent as a matter of law. Indeed, the trial court's analysis confirms this conclusion. Although applying assumption of risk principles, the court concluded that the evidence was wholly one-sided in demonstrating that Ms. Phillips "appreciated" the risk of leaving, based on her awareness of the gap under the cab, and her insistence on getting out on her stomach after first trying to exit in a sitting position despite Mr. Snow's repeated assurances that help was on the way and that she should stay put. These observations all focus squarely on the unreasonableness of her decision to ignore the risk that leaving the elevator posed to her. In our judgment, no reasonable juror could fairly conclude that Ms. Phillips acted reasonably[16] when she tried to lower herself

and acceptance of a risk" and "purposely invited" death by jumping in front of a moving Metro train. *Id.* at 175. Notably, our purpose in *Johnson* was to "acknowledge and enforce the disincentives to voluntary self-destruction on which society, through the civil law, insists." *Id.* While *Johnson* bore little resemblance to the paradigm of "unreasonable risk-taking" that constitutes contributory negligence, the present case fits well within that pattern.

14. *Id.* (Contributory negligence may arise from "an intentional and unreasonable exposure of [plaintiff] to danger created by the defendant's negligence, of which danger the plaintiff knows or has reason to know . . . .") (quoting RESTATEMENT § 466(a)).

15. See note 3, *supra.*

16. Typically, reasonableness is a question for the jury. *Lively v. Flexible Packaging Ass'n,* 830 A.2d 874, 886–87 (D.C.2003) (*en banc*). For example, if the contributory negligence analysis in this case had concerned a collision at an intersection, a jury would normally de-termine the reasonableness of Ms. Phillips's actions. *Shu v. Basinger,* 57 A.2d 295, 295–96 (D.C.1948) ("Automobile collisions at street intersections nearly always present questions of fact."). But even in collision cases, some fact patterns allow us to take the question away from the jury. *Washington v. A & H Garcias Trash Hauling Co.,* 584 A.2d 544, 545 (D.C.1990); *Frager v. Pecot,* 327 A.2d 306, 307 (D.C.1974); *D.C. Transit System, Inc. v. Harris,* 284 A.2d 277, 279 (D.C. 1971). Where reasonable persons, after viewing the facts in the light most favorable to the non-moving party, can draw but one inference from those facts, and where that one inference points "unerringly" to the conclusion that the plaintiff failed to act reasonably under the circumstances, we may find that she was contributorily negligent as a matter of law. *Starks v. North East Ins. Co.,* 408 A.2d 980, 982 (D.C.1979). We hold that this case presents such a set of facts. *See, e.g., Seavers v. Lisner,* 41 App.D.C. 183, 190–91 (D.C.Cir.1913) ("The work he was performing when injured required no such haste or engrossing attention as to reasonably cause him

from the elevator.[17]

As discussed above, the trial court also determined that a reasonable jury could excuse Ms. Phillips's negligence based on the "sudden emergency doctrine"[18] in light of her attempt to "escape from her uncomfortable situation." Though the stalling of the elevator was certainly unexpected, the law nonetheless requires a plaintiff to act reasonably in confronting such a situation unless she "must make a speedy decision between alternative courses of action and . . . therefore . . . has no time to make an accurate forecast as to the effect of [her] choice."[19] In the only case where we have previously held the doctrine applicable, the 79 year-old plaintiff was suddenly confronted with a train of shopping carts rapidly approaching her around a corner, from a distance of approximately four feet. She jumped aside, hit her foot against the curb, fell, and suffered a permanent partial disability.[20] We characterized her response as an "instinctive and natural movement to avoid the apparently impending collision."[21] In contrast, Ms. Phillips was not reacting to an impending emergency. While she may not have been comfortable in the stalled cab, appellants' own expert testified that she would have been safe had she stayed put, and she had ample reason to suppose that help was on the way. We therefore hold that the sudden emergency doctrine is inapplicable here because there was no situation requiring Ms. Phillips to act "spontaneously . . . without adequate opportunity for reflection."[22]

to forget the dangerous position in which he had voluntarily placed himself. He had been warned by Stewart that it was dangerous to project his arm or head within the shaft when the car was in motion. For four hours he had observed the operation of the elevator. He testified that, at other times, when projecting his arm or head into the shaft, he had looked up to see if the car was descending. He was warned in this instance by the pulley wheels and plunger that the car was moving, and, with no duty that required such immediate attention inside of the shaft as to justify any risk, he negligently and thoughtlessly placed himself in a position to receive the injury.")

17. Appellants (correctly) point out that an applicable building code required the elevator doors to be constructed such that they could not be opened from the inside if the elevator is beyond a certain distance from the landing. Regardless, the contention that the building code imposes a higher duty (amounting to negligence *per se* ) on appellees is wrong. We have held that such regulations only impose a standard of reasonable care, or, more accurately, they serve to indicate what the standard of reasonable care might be. *Scoggins, supra* note 10, 419 A.2d at 1005. *See Clarke v. O'Connor,* 140 U.S.App.D.C. 300, 305–07, 435 F.2d 104, 109–111 (1970); *Kanelos v. Kettler,* 132 U.S.App.D.C. 133, 138, 406 F.2d 951, 956 (1968) ("Appellee owed appellant the obligation, mandated by the Housing Regulations, to maintain the leased apartment, including the bathroom door sill, in a reasonably safe condition."). We agree that the appellees owed a duty of reasonable care to Ms. Phillips, but her own conduct, from which no reasonable juror could find that she was not contributorily negligent, still bars recovery. *District of Columbia v. Brown,* 589 A.2d 384, 387 (D.C.1991) ("[T]he Elevator Code does not insulate persons from the legal consequences of their failure to exercise ordinary care.").

18. See note 4, *supra,* and associated text.

19. RESTATEMENT § 296 cmt. b.

20. *Kelley, supra* note 4, 105 U.S.App.D.C. at 408, 267 F.2d at 685.

21. *Id.* at 409, 267 F.2d at 686.

22. *Id.* Appellants' reliance on *Mas v. Two Bridges Associates,* 75 N.Y.2d 680, 555 N.Y.S.2d 669, 554 N.E.2d 1257 (1990), is therefore misplaced. *Mas* involved a similar but distinguishable fact pattern where the plaintiff injured her foot after jumping out of a stalled elevator. Before stalling, the elevator shook from side to side and made banging noises, followed by a booming sound and a sudden, uneven descent. After it stalled, the lights went out. The passengers sounded the

## IV. Conclusion

Our *de novo* review of the trial court's ruling leads us to affirm its grant of summary judgment on the alternative ground [23] that the uncontroverted facts establish, as a matter of law, that Ms. Phillips's own negligence contributed to her death.

*So ordered.*

alarm bell for 20 minutes with no response. *Id.* at 685, 555 N.Y.S.2d 669, 554 N.E.2d at 1259. The court concluded that, from the perspective of the perspiring, crying, and screaming plaintiff, *id.*, "the lapse of time did not necessarily permit [her] the opportunity for cautious deliberation because the precariousness of her situation continued unabated." *Id.* at 686–87, 555 N.Y.S.2d 669, 554 N.E.2d at 1260. In contrast, the record here does not permit an inference that Ms. Phillips did not have an opportunity to deliberate on her situation before she decided to leave the elevator. Significantly, this was not a situation where the plaintiff believes that no help is forthcoming or where the elevator cab appears to be unstable.

23. "[A]n appellate court can uphold a trial court decision for reasons other than those given by the trial court. This principle can be traced back for several decades, and is firmly established in the District of Columbia's case law." *Prince v. United States*, 825 A.2d 928, 931–32 (D.C.2003) (citations and quotation marks omitted).